IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 19, 2023

## STATE OF TENNESSEE v. KINNEY LOUIS SPEARS

**Appeal from the Circuit Court for Dickson County
No. 22CC-2019-CR-150   Suzanne Lockert-Mash, Judge**

_____

### No. M2023-00346-CCA-R3-CD

_____

Defendant, Kinney Louis Spears, was indicted by the Houston County Grand Jury for the first degree murder of his wife, Mia Donnita Spears. The Houston County Circuit Court granted Defendant's motion for a change of venue and transferred the case to the Dickson County Circuit Court. A Dickson County jury found Defendant guilty of the lesser-included offense of second degree murder, and the trial court sentenced Defendant to serve 25 years' confinement. In this appeal as of right, Defendant asserts that the evidence is insufficient to support his conviction, that several improper comments by the prosecutor during closing argument constitute plain error, and that his sentence is excessive. Having reviewed the entire record and the briefs of the parties, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

F. Lee Spratt, Charlotte, Tennessee, for the appellant, Kinney Louis Spears.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Talmage Woodall, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts*

Defendant and Mrs. Spears were married in 1985. On August 17, 2018, Defendant and Mrs. Spears went to the War Horse Bar in Erin. They arrived between 6:30 and 7:00 p.m. Mrs. Spears' cousin Kathy Britt and her husband, David Britt, were already there celebrating Mrs. Britt's birthday. Mrs. Britt testified at trial that she and Mrs. Spears sat at the bar together. Mrs. Spears said she had been drinking before they went to the bar. Mrs. Britt did not recall how many drinks Mrs. Spears had while they were at the bar. She did not observe Defendant have any drinks that night, and Defendant did not appear to be intoxicated.

A video showing Mrs. Britt and Mrs. Spears dancing and Defendant and Mrs. Spears leaving the bar was entered as an exhibit and shown to the jury. Defendant and Mrs. Spears left the bar at around 9:00 p.m. The video showed Mrs. Spears stumble while dancing and Mrs. Britt helping her to her seat. Mrs. Spears stumbled again while leaving the bar, and Mr. Britt helped her walk to the car.

Susan Nichols was also at the War Horse Bar on the night of Mrs. Britt's birthday party. She left the bar at around 11:00 p.m. and drove by Defendant's and Mrs. Spears' house on her way home. She recalled seeing Defendant's truck in the driveway, and she saw a "small light" on inside the house, but no one was outside.

The following morning, Defendant called 9-1-1. A recording of the 9-1-1 call was entered as an exhibit and played for the jury. Jerry Hamilton, a paramedic with Houston County EMS, arrived at the Spears' residence at 9:19 a.m. He spoke with Defendant, who was "frantic." Defendant repeatedly told Mr. Hamilton, "they're going to think I did it but I didn't do anything." Defendant told Mr. Hamilton that Mrs. Spears was in the back bedroom. Mr. Hamilton found Mrs. Spears lying face down in the bathroom with her arms out in front of her. She was "black and blue" and was deceased. Mr. Hamilton asked Defendant when he had last seen her alive, and Defendant said "she had been gasping for air" about 20 or 30 minutes before paramedics arrived. Defendant said he had tried to help Mrs. Spears get in the shower and she had fallen several times.

Paramedics pulled Mrs. Spears into the bedroom and rolled her over. Mr. Hamilton saw lividity in her face and on her chest. He explained that lividity is "where blood pools from no circulation[,]" and it is a sign of "obvious death." He testified that lividity can be seen about 30 minutes after death, but full onset is between two and four hours after death. Mr. Hamilton could not determine how long Mrs. Spears had been deceased based on the lividity in her body. He observed "severe blunt trauma" to her face and head. She had blood coming from her head, and it was matted in her hair. She also had bruising on her arms and back.

Houston County EMS Director Steven Graybill responded to a call for "immediate assistance" at the Spears' residence. When he arrived at 9:30 a.m., another EMT led him to the back bedroom, where Mr. Graybill observed Mrs. Spears lying naked on her back on the floor. She had two black eyes, and she was cold to the touch. He saw lividity in the left side of Mrs. Spears' face, and in checking for rigor mortis, he observed that she "was kind of stiffened." Mr. Graybill estimated that Mrs. Spears had died between two and four hours earlier. Mr. Graybill saw "a bunch of blood" in the bathroom. He then directed the other EMTs on scene to exit the residence until police arrived to secure the scene.

Mr. Britt heard ambulances and drove to the Spears' residence about one-quarter of a mile from his house. When he arrived, Defendant was standing in the yard. Defendant told Mr. Britt, "I didn't have anything to do with this." Defendant said on their way home from the bar, Mrs. Spears said she had to use the bathroom, and Defendant told her she could wait until they got home. He said when they pulled into the driveway, Mrs. Spears opened the door before the truck stopped and "face-planted immediately" beside the truck. Before Defendant could get around the truck to help Mrs. Spears, she got up and "face-planted again." Defendant said they "got to the porch, [and] she face-planted again on the porch and had used the bathroom on herself."

Erin police officer Tera Dillard responded to the scene around 9:30 or 10:00 a.m. Officer Dillard knew Mrs. Spears because her mother and Mrs. Spears were friends. Officer Dillard testified Mrs. Spears was unrecognizable from the bruising on her face.

Brandt Holt, an agent with the Tennessee Bureau of Investigation at the time of the offense, investigated the scene. Agent Holt found an earring on the ground beside the passenger side of Defendant's truck and a matching earring on the ground between the truck and the house. He observed planters that appeared to have been knocked off the front porch and several reddish-brown stains on the porch steps, the porch floor, a porch post, the front door, and inside the house. A forensic analysis of the stains that were tested revealed they were Mrs. Spears' blood. There were also large reddish-brown stains in the yard and what looked like human hair. A "small portion" of a ratchet strap with a metal piece was found on the porch railing. Mrs. Spears' blood was found on both the metal and fabric part of the strap.

Agent Holt interviewed Defendant at the Houston County Sheriff's Office. An audio recording of the interview was played for the jury. At the beginning of the interview, Defendant stated, "Nobody is going to believe me. The only person that can back me up is not here." He added,

> She's dead because of me. She's dead because of my ignorance because I
> didn't realize how bad she was hurt, I don't guess, and called somebody, but

- 3 -

I -- now, everything about her, her body, that's on me. I drug her. That's on me. But I did not do that to her eyes besides maybe one time when I dropped her. I swear to God.

Defendant stated that he drank a pint of whiskey and Mrs. Spears drank rum and Coke before they left to go the bar. Defendant did not drink anything at the bar. Mrs. Spears drank something at the bar, but he did not know what or how much she had. He said they left the bar to go home because Mrs. Spears needed to use the bathroom. They arrived home around 9:30 p.m. Mrs. Spears exited the truck and "fell hard" in the grass. Defendant helped her get up, and she "took off running wobbly and then it's just like she jumped forward and she face planted right in the grass again, like at an angle, going toward the front porch." Defendant said he tried to move her and "couldn't get her up." He then smelled feces and removed her pants. He retrieved scissors from the house to cut her pants off of her and then returned to the house to get a rag to clean her. He tried to pull her, and her shirt came off. He smelled feces on her bra, so he cut it off. At that point, Mrs. Spears was completely naked in the front yard, and she "started mumbling." Defendant helped her get up and tried walking her to the house. She fell again, and Defendant tripped over her.

Defendant dragged her and sat her up in the yard. He tried to wake her up by slapping her and pulling her hair, but he "did not hit her hard." Defendant said he picked her up and got about halfway up the porch steps before he "had to let her go" and "she kind of slid backwards" and hit her head on the brick steps. Defendant said Mrs. Spears' head did not bounce when it hit the bricks, but he noticed that she had blood in her hair. He tried to open the door while holding her up, but he "let her go and she fell backwards across them bricks." When she fell, she knocked one of the concrete planters off the porch. Defendant stumbled while trying to catch her and knocked the other planter off the porch. Defendant turned Mrs. Spears onto her stomach and straddled her to lift her. Mrs. Spears said Defendant was hurting her so he put her down. Her face fell flat onto the concrete porch. Defendant could see that her eyes were starting to swell.

Defendant stated that he tried to wake Mrs. Spears by spraying her with cold water from a hose. He then got a ratchet strap that they used as a dog lead to make "a deer drag" to pull Mrs. Spears into the house. He put it under her breasts and "g[a]ve it all [he] had and [he] got her to the threshold[,]" but the strap slipped up around her neck and was choking her. Defendant "g[a]ve it a couple more heaves" and got her through the doorway. He moved her legs and closed the front door. Defendant saw "how bad her head was bleeding" and got some towels. It was 11:45 p.m. at that point. Defendant went back outside and sprayed off the porch because he was afraid someone might see "all this blood on the porch." Defendant said he did not call for help because "everybody out there is pretty judgmental." He said, "if I would have called 9-1-1 and it would have been she was

- 4 -

drunk, she would have got mad at me because she's pretty self-conscious about how people perceive her.  And I guess I am too."

Defendant left Mrs. Spears in the foyer and went to the bedroom and turned on the television.  He said the "[n]ext thing" he knew, it was 3:00 a.m.  He went to Mrs. Spears and asked her if she was ready to get cleaned up, and she told him she wanted to sleep.  He saw dried blood in the foyer.  Defendant said, "Honest to God, I didn't think there was anything wrong with her but she was drunk."  Defendant said he would have called 9-1-1 if he had "an inkling" that Mrs. Spears had "some kind of head injury or something like that."  Defendant then went back to bed and slept until 8:00 a.m.  He said he told Mrs. Spears to get up, and she said she wanted to sleep.  Defendant asked her if she had taken one of his gabapentin, which he said he used for diabetic nerve pain.  Defendant took the dogs outside using the strap he had used to drag Mrs. Spears into the house, and one of the dogs ran away with it.  Defendant returned to Mrs. Spears and told her he was taking her to the bathtub.  He used a blanket to drag her down the hallway.  Defendant saw "how bad her eyes w[ere,]" and told her he was worried that someone would think he had "done this to [her]."  Defendant told Agent Holt that he was "just ignorant" and that he thought Mrs. Spears was drunk.

Defendant said he went outside to look for the missing dog.  He then returned to the house and dragged Mrs. Spears to the bedroom.  Mrs. Spears asked for a drink of water at around 8:30 a.m.  Defendant said Mrs. Spears "tried to get up on her hands and knees[,]" and he tried to give her a sip of water.  Defendant continued dragging Mrs. Spears into the bathroom, and "she actually moved her legs this time and tried to help [him]."  He tried to put her in the bathtub but could not lift her.  Defendant got a wet rag and cleaned up the dried blood in the foyer and hallway.  Defendant said that he had put Mrs. Spears' dirty clothing and the sheets and towels in the washing machine but did not wash them.

When Defendant returned to Mrs. Spears, he "could tell there was something different."  Mrs. Spears was unresponsive.  Defendant realized she was "more than drunk."  Defendant touched her and "got wet blood" on his hand.  Defendant said, until that point, he did not realize she was still bleeding from the back of her head.  Defendant "panicked" and "tried to breathe in her mouth."  Mrs. Spears "was making a gurgling sound."  Defendant then noticed that Mrs. Spears had urinated.  He called 9-1-1, but he said, "it was just too f[***]ing late.  It's my f[***]ing fault.  If I would have just had some f[***]ing sense."  He said, "I wouldn't have intentionally hurt her for nothing in the world."  Defendant denied that he hit Mrs. Spears.  He said he "drug the piss out of her."  He "tried dragging her, rolling her, dropped her, stepped on her, fell on her."

Daniel Chadderdon testified for the State that while he and Defendant were incarcerated together, Defendant asked him, "'[I]f I killed my wife and I was the only

beneficiary of the insurance policy would I still get it[?]'" About the incident, Defendant told him that he and the victim had been drinking at a party and argued in the truck on the way home. Defendant said, "'before I knew it I popped her one.'" Defendant also said the victim stumbled out of the truck and fell on her face and Defendant went into the house to "get a dog leash or rope or something" to help get the victim inside. Mr. Chadderdon said Defendant told him that when he went back outside, he "tripped over her and accidentally kicked her in the face. And as he was getting up, he said he slipped and kicked her again." Defendant said he got the victim inside and laid her down on her side. The next morning, the victim asked for water and started gurgling. Defendant went outside to clean the blood off his truck and the porch, and when he went back inside, the victim was not breathing and he called 9-1-1.

The State presented evidence of a $50,000 life insurance policy owned by and insuring the victim designating Defendant as the sole beneficiary. Defendant told Agent Holt he had filed bankruptcy and his truck was being repossessed.

Dr. Emily Dennison, a forensic pathologist with the Nashville Medical Examiner's Office, performed an autopsy on the victim. Dr. Dennison determined that the victim died from blunt force trauma and strangulation and concluded that the manner of death was homicide. Dr. Dennison observed multiple contusions, abrasions, and lacerations "all the way around [the victim's] head and neck." She explained that the injuries were caused by "multiple blows, because they're on different planes." She testified that bruising and lacerations "all the way around her head and neck" could not be the result of a single fall. The victim had several tears to the back of her scalp, and at least one of the scalp lacerations was transmural, meaning it went through all the layers of the scalp.

Dr. Dennison also observed multiple hemorrhages of the scalp and brain, as well as fractures of the cervical and thoracic vertebrae and multiple rib fractures on both sides. Dr. Dennison opined that the location of the rib fractures "on the posterior lateral aspect" were not caused by CPR. Additionally, a significant amount of hemorrhaging in the area of the fractures indicated that the victim was alive when those injuries occurred. Dr. Dennison explained that hemorrhaging occurs before death and that blood does not flow to injured areas of the body after death. She testified that the type of injuries sustained by the victim could occur in car accidents, "falls from a very significant height," and assaults. She agreed that some of the victim's injuries "could be consistent with multiple falls[;]" however, the victim's bilateral rib fractures were not consistent with a fall off a porch.

The victim had petechial hemorrhages, or burst blood vessels, in one eye and deep red bruising and swelling around both eyes. Dr. Dennison observed bruising behind both of the victim's ears and swelling of the right ear, which had started to become "cauliflower ear." Dr. Dennison testified, "[w]e're always suspicious of bruising around the ear,

particularly behind the ear.  If you fall, it's difficult to get an injury to that part of your head.  Usually that's fairly well protected from a fall.  It kind of depends on the fall."

The victim had bruising and abrasions to the neck, which are commonly associated with ligature asphyxiation, and deep muscle hemorrhages in the neck.  Dr. Dennison testified that the victim's second and third cervical vertebrae were fractured.  She explained that this type of injury is caused by a "severe, quick acceleration of the neck" and is "referred to as a hangman's fracture."  She testified, "if you have fractures or damage to that area, you are compromising the areas of your brain that tell you to breath[e] and your heart to beat.  So most of the time an injury to this area would be almost immediately fatal."  The victim's hyoid bone, "which is a bone that sits up high in your neck," was not fractured and was intact.  Dr. Dennison agreed that the injury could occur from a "fall forward with [the] neck extended upward."  The victim also had several post-mortem abrasions on her torso and leg.  Dr. Dennison identified and the State introduced 46 photographs taken during the victim's autopsy.  A toxicology report indicated that the victim's blood alcohol content was .09 percent.

Defendant did not testify or present any other proof at trial.

The jury found Defendant guilty of second degree murder.  Following a sentencing hearing, the trial court found three enhancement factors to be applicable and gave "little regard to the mitigating factors."  The court sentenced Defendant as a Range I standard offender to 25 years in prison with no release eligibility.  The trial court denied Defendant's motion for new trial, and Defendant timely appealed.

***Analysis***

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence in support of his second degree murder conviction.  Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.").

A criminal offense may be established entirely by circumstantial evidence. *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent

with the guilt of the defendant and inconsistent with his innocence. *State v. James*, 315 S.W.3d 440, 456 (Tenn. 2010). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the second degree murder conviction, the State had to prove beyond a reasonable doubt that Defendant committed a knowing killing of his wife. *See* T.C.A. § 39-13-210(a)(1). "In second degree murder, the result of the conduct is the sole element of the offense. . . . The statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Whether a defendant acted "knowingly" in killing another is a question of fact to be addressed by the jury. *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) (citations omitted). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)).

Defendant maintains that the victim's death was accidental and that the proof failed to establish that he knowingly caused Mrs. Spears' death. We disagree. Defendant's admissions and the medical evidence are sufficient to sustain Defendant's conviction.

The State presented expert testimony regarding the severity of the victim's injuries. Dr. Dennison, who performed the victim's autopsy, concluded that the victim died by strangulation as well as blunt force trauma. She testified that Mrs. Spears suffered "a lot of different types of blunt trauma . . . all the way around her head and neck" and that the blunt force trauma caused Mrs. Spears to have multiple deep hemorrhages of the scalp and brain. Defendant asserts that the evidence supports his version of events. He points to Dr. Dennison's admission that the victim's fractured cervical vertebrae could have occurred when she fell forward and hyperextended her neck. However, the jury was free to discount Defendant's theory that the victim's neck was broken when she "face planted" in the yard.

Dr. Dennison testified that the "hangman's fracture" would have been almost immediately fatal. According to Defendant, the victim lived for nine or ten hours after she fell in the yard. Additionally, the victim had petechial hemorrhaging around her eyes, which is associated with asphyxiation. Dr. Dennison explained that a "hangman's fracture" is caused by a "severe quick acceleration to the neck." Defendant said that he put the ratchet strap around Mrs. Spears and "g[a]ve it all [he] had and [he] got her to the threshold." He said he then realized that the strap had slipped up around her neck and was choking her. The jury could have reasonably inferred that Defendant broke Mrs. Spears' neck when he heaved her body with the strap around her neck. Dr. Dennison observed that the victim had several post-mortem abrasions, which could have been caused by Defendant's dragging the victim's body after her death occurred.

Defendant asserts that his leaving the soiled items in the washing machine and not starting it "are not the actions of someone who knowingly committed the killing of another, rather, that this shows a lack of awareness of his actions." Again, the jury was free to discount Defendant's explanation that the victim's death was accidental. Based on the severity of the victim's injuries, a rational jury could have inferred that Defendant knew his actions would cause the victim's death. Defendant acknowledged that he knew the victim was bleeding from the head, and he did not call for help. He admitted to having washed blood off the porch.

Viewed in the light most favorable to the State, the evidence established that Defendant was aware that his conduct was reasonably certain to cause Mrs. Spears' death. *See Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) ("To sustain a finding that a defendant acted knowingly, the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death."). Defendant is not entitled to relief on this issue.

*Closing Argument*

Defendant contends that the prosecutor made numerous improper and "outrageous" statements during closing argument. The State argues that Defendant has waived consideration of the issue by his failure to object to the comments at trial and that none of the comments rise to the level of plain error.

"[I]t is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument[,]" as "[a] contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010) (footnote omitted). A defendant's failure to object contemporaneously will constitute a waiver of the issue on appeal. *Id*. at 58 (citing Tenn. R. App. P. 36(a)). "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022).

We may consider an issue to be plain error when all five of the following factors are met:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

This Court has observed that there are five generally recognized areas of improper closing argument: when the prosecutor 1) intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; 2) expresses his or her personal opinion on the evidence or the defendant's guilt; 3) uses arguments calculated to inflame the passions or prejudices of the jury; 4) diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and 5) intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App.

2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999).

Defendant complains about the prosecutor's comment that "[Defendant], in his self-serving statement in my opinion, he says that -- he kind of makes it seem like it was an accident." Defendant asserts that a clear and unequivocal rule of law was breached when the prosecutor expressed a personal belief or opinion as to Defendant's credibility. *See State v. West*, 767 S.W.2d 387, 394 (Tenn. 1989). The State responds that the prosecutor's comment was not a statement of his opinion as to the credibility of Defendant's statement, but rather a characterization of Defendant's statement as "self-serving." We agree with the State.

Although the prosecutor explicitly said it was "his opinion" that Defendant's statement that the victim's death was an accident was self-serving, his comment was not a comment on the credibility of Defendant or on Defendant's guilt or innocence. *See State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) ("[W]hether [a prosecutor's comment] qualifies as misconduct often depends upon the specific terminology used. . . . [A]rgument predicated by the words 'I think' or 'I submit' does not necessarily indicate an expression of personal opinion."). The prosecutor's characterization of Defendant's statements as "self-serving" does not rise to the level of plain error. An accused's statement is often "self-serving," and the prosecutor did not comment on Defendant's credibility, but rather on Defendant's claim that the victim's death was an accident. Defendant has failed to establish that the prosecutor breached a clear and unequivocal rule of law or that a substantial right of his was adversely affected.

Moreover, Defendant has not established that defense counsel's decision not to object was not strategic. "[I]t is well-established that the plain error rule is not applicable when the record reflects that a defendant made a deliberate, tactical choice to waive an objection." *Smith*, 24 S.W.3d at 283 (internal quotation marks and alterations omitted). In *Smith*, our supreme court held that defense counsel's decision not to object "was a result of a deliberate, tactical trial strategy" where the objectionable evidence helped the defense theory of the case. *Id*. Defendant repeatedly stated that he did not mean to cause Mrs. Spears' injuries and that he did not think anyone would believe him. He told Mr. Hamilton and Mr. Britt that he "didn't do anything" and that Mrs. Spears fell several times because she was drunk. He told Agent Holt, "Nobody is going to believe me." He admitted Mrs. Spears was "dead because of [his] ignorance because [he] didn't realize how bad she was hurt[.]" Defendant's entire theory of the case was that Mrs. Spears' death was accidental.

Defendant next contends that the prosecutor made several misstatements of the evidence to the jury. First, Defendant asserts the prosecutor misstated the evidence when he said, "there's a lot of blood streaming from her head right now[,]" while describing events that occurred outside the residence. Defendant asserts that because the reddish-brown stains found in the yard and leading up the porch steps were not forensically analyzed and shown to be Mrs. Spears' blood, the prosecutor's comment was a misstatement of the evidence. However, Defendant told Agent Holt that Mrs. Spears' head was bleeding and that there was blood on the porch. Defendant stated that he sprayed the blood off the porch with a hose. Dr. Dennison testified that the deep lacerations on Mrs. Spears' scalp would have bled profusely. The prosecutor's comment that Mrs. Spears had "blood streaming from her head" was supported by the evidence and not a misstatement of the evidence. Therefore, no clear and unequivocal rule of law was breached.

Defendant next challenges the prosecutor's statement, in describing Defendant's failure to render care, "[w]hat type of first aid in anyone's mind would ever include ratcheting a strap around your wife's neck to the point where the cartilage in her throat is crushed[?]" Defendant asserts that the prosecutor's comment was a "gross misstatement" of the evidence because Dr. Dennison testified that there are "just two tiny little pieces of cartilage" that can "fracture easily[,]" and although there was hemorrhaging "in the anterior portion of [the victim's] neck[,]" the hyoid bone was not fractured.

We agree with Defendant that that the prosecutor misstated the evidence in this instance. This Court has held that "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." *Goltz*, 111 S.W.3d at 6. The State argues that in light of the "extensive, detailed, and complicated" testimony given by Dr. Dennison, the prosecutor's comment was not an intentional misstatement of the evidence. The medical evidence in this case was complex and lengthy. Although the prosecutor's comment was improper, it does not rise to the level of plain error. Dr. Dennison testified that Mrs. Spears' death was caused in part by strangulation, that she had ligature marks on her neck and hemorrhaging in her neck. Moreover, Defendant's account of the incident included his statement that he pulled on the strap after it slipped up around Mrs. Spears' neck. We conclude that no substantial right of Defendant was adversely affected and that the error was not of such magnitude that it probably changed the outcome of the trial.

Finally, Defendant contends that the prosecutor misstated the evidence when he referred to a portion of Defendant's recorded statement and argued:

> What I should have done, now, in hindsight, 20/20 -- this is him --
> what I should have done, hindsight 2020, I guess I should have laid -- let

her lay out there in the yard and shop-vac'd the thing. That's what the Defendant says. He wasn't going to call 911. He was never going to render first aid. Why? Because he killed her. He was killing her.

No, he was actually going to shop-vac the place. Shop-vac what? The evidence? What was he going to shop-vac in the front yard?

Defendant asserts that the transcript of his recorded statement contained "an obvious typographical error" and that Defendant never made any statement about a shop-vac. At the hearing on Defendant's motion for new trial, defense counsel argued that it was "obvious when you read it in context" that Defendant actually said, in hindsight, he should have gotten "Kathy" or "David" to help. In his brief to this Court, Defendant states he could "clearly" be understood to say, "What I should have done, now in hindsight 20/20, I guess I should have let her lay out there in the yard and shot back over to the thing, tried to maybe get David or Kathy to come help me."

We, having listened to the audio recording that was played for the jury and compared it to the transcript of Defendant's interview, find it difficult to understand whether Defendant says "shot back" or "shop-vac". When taken in context, however, it is more sensible that Defendant stated, in hind-sight, he should have left Mrs. Spears in the yard while he returned to get Mr. and Mrs. Britt to assist him. Regardless, the State does not dispute Defendant's assertion that "shop-vac" in the transcript is inaccurate and a typographical error. The State argues only that any error "is undoubtedly harmless."

The audio recording of Defendant's interview was played for the jury and admitted as evidence. Even if the prosecutor's comment was a misstatement of the evidence, we again conclude that it was not an intentional misstatement, and furthermore, the trial court instructed the jury that any discrepancy between the transcript of Defendant's interview and the audio recording should be resolved in favor of the recording. Juries are presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). Therefore, we cannot conclude that a substantial right of Defendant was adversely affected or that the error was of such magnitude that it probably changed the outcome of the trial. Defendant is not entitled to plain error relief.

*Sentencing*

Defendant contends that his 25-year sentence is excessive. The State responds that the trial court acted within its discretion in imposing Defendant's sentence. We agree with the State.

- 13 -

When a defendant challenges the length or manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Defendant was convicted of a Class A felony, and the trial court imposed the maximum sentence within the range of 25 years. *See* T.C.A. § 40-35-112(a)(1). Defendant asserts that the trial court misapplied enhancement factor (9) because the proof at trial did not establish that Defendant used a weapon to cause Mrs. Spears' death. *See* T.C.A. § 40-35-114(9). Defendant argues that the trial court erred in determining that "certainly, a strap of that nature used in the manner in which it was used could be denoted as a deadly weapon." Defendant asserts that the trial court also misapplied enhancement factor (6) and erred by sua sponte finding that the victim's injuries were particularly great. *See* T.C.A. § 40-35-114(6). Defendant argues that the court's application of this enhancement factor was error because "death is an inherent element of [s]econd [d]egree [m]urder." *See State v. Trent*, No. E2018-02239-CCA-R3-CD, 2020 WL 1899610, at *11 (Tenn. Crim. App. Apr. 17, 2020) (concluding that the trial court applied enhancement factor (6) in error because the death of the victim is an element of vehicular homicide), *no perm. app. filed*.

Finally, Defendant asserts that the trial court did not give appropriate weight to mitigating factor (13), although Defendant acknowledges that the trial court commented at the sentencing hearing that Defendant "certainly doesn't have any criminal record." *See* T.C.A. § 40-35-113(13). Defendant does not challenge, however, the trial court's application of enhancement factor (5), that Defendant treated Mrs. Spears "with exceptional cruelty during the commission of the offense." *See* T.C.A. § 40-35-114(5). Defendant apparently concedes that the trial court's application of this enhancement factor based on "the injuries, the timelines, the amount of the injuries" was proper.

Although the trial court should consider enhancement and mitigating factors, the enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *Carter*, 254 S.W.3d at 343. Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound

discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343 (quoting T.C.A. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

Our review of the record indicates that the trial court imposed a within-range sentence after properly considering the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the parties' arguments, and the nature and characteristics of the crime. T.C.A. §§ 40-35-103(5), -210(b). There is no dispute that the trial court properly imposed at least one enhancing factor (T.C.A. § 40-35-114(5)). Additionally, there is nothing in the record to substantiate an abuse of discretion by the trial court for failing to apply appropriate weight to Defendant's lack of criminal history. Therefore, Defendant's sentence is presumed reasonable, and Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE